**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Steve Podkulski

    v.                                       Civil No. 11-cv-102-JL

Jane Doe et al.


**REPORT AND RECOMMENDATION**


Before the court is pro se plaintiff Steve Podkulski's complaint (doc. no. 1), which asserts claims against officers and supervisors at the Hillsborough County Department of Corrections ("HCDC"), in their individual and official capacities: Superintendent James O'Mara; six HCDC John and Jane Doe officers and sergeants; HCDC Lt. Robinson, whose first name is unknown ("FNU"); HCDC Officer FNU Barbara; HCDC Officer FNU Hujsak; and HCDC Sgt. FNU Gordon.  The matter is before the court for preliminary review to determine if Podkulski has stated a claim upon which relief can be granted.  See 28 U.S.C. § 1915A; United States District Court, District of New Hampshire Local Rule ("LR") 4.3(d)(2) (inmate complaints forwarded to magistrate judge for preliminary review).

## Standard of Review

Under LR 4.3(d)(2), when an incarcerated plaintiff
commences an action pro se, the magistrate judge conducts a
preliminary review.  The magistrate judge may issue a report and
recommendation after the initial review, recommending that
claims be dismissed if the court lacks subject matter
jurisdiction, the defendant is immune from the relief sought,
the complaint fails to state a claim upon which relief may be
granted, the allegation of poverty is untrue, or the action is
frivolous or malicious.  See id. (citing 28 U.S.C. § 1915A &
Fed. R. Civ. P. 12(b)(1)).  In conducting a preliminary review,
the magistrate judge construes pro se pleadings liberally, to
avoid inappropriately stringent rules and unnecessary
dismissals.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per
curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976),
to construe pleadings liberally in favor of pro se party);
Castro v. United States, 540 U.S. 375, 381 (2003).

To determine if a complaint states any claim upon which
relief could be granted, the court applies a standard analogous
to that used in reviewing a motion to dismiss filed under Fed.
R. Civ. P. 12(b)(6).  The court decides whether the complaint
contains sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face.  See Ashcroft v. Iqbal, 556 U.S. 662, ___ , 129 S. Ct. 1937, 1949 (2009).

To make this determination, the court employs a two-pronged approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  The court first screens the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (citations, internal quotation marks and alterations omitted).  A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed.  Id.  The second part of the test requires the court to credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then to determine if the claim is plausible.  Id.  The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). The "make-or-break standard" is that those allegations and inferences, taken as true, "must state a plausible, not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at 555-56 ("Factual allegations must be enough to raise a right to

relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations and footnote omitted)).

Evaluating the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Iqbal</u>, 556 U.S. at ___, 129 S. Ct. at 1950 (citation omitted).  In doing so, the court may not disregard properly pleaded factual allegations or "attempt to forecast a plaintiff's likelihood of success on the merits." <u>Ocasio-Hernández</u>, 640 F.3d at 13.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." <u>Id.</u>

## Background

Podkulski is a prisoner who was detained pretrial at HCDC for a period of time until November 29, 2010, and who remained incarcerated at HCDC for a period of time as a convicted prisoner.  The claims here arise from incidents occurring at the HCDC from November 2010 through January 2011.

While in pretrial detention, on November 17, 2010, Podkulski told a female sergeant and a male officer that he was prone to seizures and needed to sleep on the bottom bunk.  Both

officers acknowledged his comment by saying, "too bad," but
refused to allow him to move to the bottom bunk.  Later that
night, Podkulski had a seizure, fell from the top bunk, and
injured his neck and back.

Podkulski told Officer Hujsak the next day, November 18,
2010, that he wanted to file grievances about violations of his
constitutional rights.  Hujsak told Podkulski that he would
receive a disciplinary report for asking for grievance forms.  A
sergeant speaking with Podkulski several hours later told him
that if he wanted to file grievances, he would be sent to
segregation.  The sergeant promised to "personally beat the
shit" out of Podkulski if he wanted to file grievances.
Podkulski quit pursuing his grievances at that time for fear of
being beaten up.

Three days later, on November 21, 2010, Sgt. Gordon told
Podkulski that he would be sent to segregation and beaten up for
explaining to a cellmate how to file grievances.  While Gordon
was escorting Podkulski to a segregation cell, Lt. Robinson
approached them and told Podkulski he would be taught a lesson.
Officer Barbara restrained Podkulski in the segregation cell
while Sgt. Gordon struck him and maced him in both ears.
Barbara told Podkulski that he was a "leech," that "we don't

like grievance and lawsuit filers," and that Podkulski was lucky

they did not kill him.  Podkulski had been complying with all

orders given to him in the segregation cell when these assaults

occurred.

On November 21, 2010, Podkulski was placed in a cell that

had urine and feces on the floor and smeared under the bed.

When Podkulski complained, an officer told him that his cell

would not be cleaned.  HCDC staff did not clean the cell until

November 24, 2010, after Podkulski had been exposed to human

waste for four days.

For an eight week period, beginning on November 21, 2010,

while he was in pretrial detention, continuing past the date of

his conviction, and ending on January 23, 2011, Podkulski was

confined in administrative segregation.  While in administrative

segregation, Podkulski could not possess any reading materials,

or order commissary hygiene items, including toothpaste,

deodorant, cough drops, and antacids.  Inmates in administrative

segregation who made their beds and cleaned their cells were

allowed one hour of out-of-cell time each day when they could

brush their teeth, shower, get exercise, read a newspaper, write

letters, receive mail, and contact counsel by phone or letter.

Because Podkulski refused to make his bed each day of his eight

week segregation, guards did not allow him to leave his cell,

except for a few days in the middle of the eight week period.

None of Podkulski's cells at HCDC had lights that

functioned at night; guards turned off the power to the cell

lights for an unspecified number of hours each night.  The lack

of night-time light prevented Podkulski from reading, doing

legal work, or seeing the toilet in the dark.

### Claims

The complaint (doc. no. 1) asserts the following claims[1]:

1.   Defendants are liable under 42 U.S.C. § 1983 for
violating Podkulski's Fourteenth Amendment rights in that:
(a) a female sergeant and a male officer on November 17,
2010, aware that Podkulski could have seizures, ordered him
to sleep on the top bunk, which resulted in Podkulski
injuring his back and neck when he fell to the floor that
night; and (b) Podkulski was housed in a cell that had
fecal matter and urine on the floor and under his bed,
which guards refused to clean up for four days.

2.   Defendants are liable under 42 U.S.C. § 1983 for
retaliating against Podkulski for exercising his First
Amendment rights, in that (a) Officer Hujsak said he would
file a disciplinary report against Podkulski for asking for
grievance forms; (b) a male sergeant threatened to place
Podkulski in segregation and to beat him up if he filed
grievances; and (c) Sgt. Gordon, with the assistance of
Officer Barbara, assaulted Podkulski for telling other
inmates how to file grievances and lawsuits.

---

[1]The claims identified herein shall be construed to be the
claims raised in the complaint (doc. no. 1) for all purposes in
this case.  If Podkulski disagrees with this identification of
his claims, he must properly file an objection to this Report
and Recommendation, or a motion to amend his complaint.

3.   Defendants are liable to Podkulski under 42 U.S.C.
§ 1983, in that Sgt. Gordon, with the assistance of Officer
Barbara, assaulted Podkulski, and subjected him to
excessive force in violation of his Fourteenth Amendment
due process rights.

4.   Defendants are liable for violating Podkulski's First
Amendment rights in that he was not allowed to possess
reading materials, write letters, or receive mail while in
administrative segregation for eight weeks;

5.   Defendants are liable for violating Podkulski's right
to counsel and to access the courts, by preventing
Podkulski from contacting his counsel by mail or phone for
eight weeks while he was in administrative segregation, and
by preventing him from doing legal work each night when the
lights were out.

6.   Defendants are liable for violating Podkulski's
rights, under the Fourteenth and Eighth Amendments, not to
be subjected to unconstitutional conditions of confinement,
in that:

     (a) Podkulski lacked access to night-time lighting in
     his HCDC cells, and the resulting darkness prevented
     him from reading or seeing the toilet at night;

     (b) while in administrative segregation for eight
     weeks, Podkulski was confined in his cell twenty-four
     hours per day, almost every day, because he refused to
     make his bed, which prevented him from showering,
     brushing his teeth, and exercising out of his cell;
     and

     (c) while in administrative segregation for eight
     weeks, Podkulski could not purchase hygiene items
     through the commissary.

**Discussion**

I.   Endangerment

The constitution requires prison officials to take "reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).  To establish an endangerment claim, an inmate must assert facts to demonstrate that, objectively, he was incarcerated "under conditions posing a substantial risk of serious harm," and that the involved prison officials knew of and disregarded an excessive risk to the inmate's safety.  Id. at 834; see also Mosher v. Nelson, 589 F.3d 488, 493 n.3 (1st Cir. 2009) (same standard applies to convicted prisoner's Eighth Amendment and pretrial detainee's Fourteenth Amendment endangerment claims).

To demonstrate deliberate indifference, a plaintiff must show that a prison official was subjectively aware of facts giving rise to an inference that there was a substantial risk of serious harm, and also that the prison official drew that inference when he or she failed to take reasonable measures to abate it.  See Mosher, 589 F.3d at 494; see also Farmer, 511 U.S. at 847.  If a risk is obvious, the trier may infer that a defendant knew of the risk, but proof that a risk was obvious does not necessarily establish the requisite scienter.  See

Farmer, 511 U.S. at 844 ("That a trier of fact may infer knowledge from the obvious . . . does not mean that it must do so.").

    A.   Top Bunk

Podkulski asserts that his due process right to safe conditions of confinement was violated when officers ordered him to sleep on the top bunk on November 17, 2010.  Specifically, on that date, Podkulski notified officers that he had a seizure disorder and needed to sleep on a bottom bunk, but those officers ordered him to sleep on the top bunk.  Podkulski injured his back and neck when he had a seizure and fell to the floor that night.

Podkulski has shown that the officers who ordered him to sleep on the top bunk were aware of the risk that he could fall from the top bunk.  The court infers from the facts alleged that the top bunk was sufficiently elevated from the floor to make it obvious that an adult prone to seizures could suffer a serious injury from falling.  The facts alleged give rise to a reasonable inference that those officers knew of that risk of serious injury but failed to take any measures to abate that the risk.  The facts alleged are thus sufficient at this stage of the case to state a claim that the male officer and female

sergeant violated Podkulski's Fourteenth Amendment right to due process in ordering him to sleep in the top bunk under those circumstances.  That claim may not be served until Podkulski identifies the officers by name.[2]

### B.   Exposure to Human Waste

Podkulski has also asserted that his health and safety was endangered when he was placed in a cell on November 21, 2010, that had another inmate's urine and feces on the floor and smeared under the bed.  When he complained about the mess to a prison guard, the officer told him that the HCDC staff would not clean up his cell.  The cell was eventually cleaned on November 24, 2010, after Podkulski had lived in the contaminated cell for four days.  At the time in question, Podkulski was a pretrial detainee.

The facts alleged in the complaint are sufficient to state a claim that the John Doe officer[s] to whom Podkulski complained about the feces and urine knew of an obvious, serious

---

[2]To pursue claims against any "John Doe" and "Jane Doe" sergeants and officers, Podkulski must obtain each person's full name and move to amend the complaint.  To this end, after the complaint has been served, Podkulski may serve defendants with interrogatories to obtain the names at issue, pursuant to Fed. R. Civ. P. 33.  See also Fed. R. Civ. P. 26(a)(1)(B)(iv) and 26(d)(1) (actions brought pro se by inmates in state custody are exempt from discovery moratorium).

risk to Podkulski's health, but failed to take reasonable measures to abate that risk for days.  See McBride v. Deer, 240 F.3d 1287, 1292 (10th Cir. 2001) (inmate exposed to human waste for three days in his cell stated viable Eighth Amendment claim).  Accordingly, in an Order issued on this date, the court has indicated that it may authorize service of this claim after Podkulski names the officers who refused to clean the cell.

II.  Retaliation

The First Amendment shields prisoners from retaliation in response to their engaging in speech or other conduct protected by the First Amendment.  See Ortiz v. Jordan, ___ U.S. ___, ___, 131 S. Ct. 884, 893 (2011) (citing Crawford-El v. Britton, 523 U.S. 574, 592 (1998)).  To state a claim for retaliation for the exercise of First Amendment rights, a plaintiff must allege that: (1) the conduct which led to the alleged retaliation was protected by the First Amendment; (2) he suffered adverse action at the hands of the prison officials; and (3) there was a causal link between the exercise of his First Amendment rights and the adverse action taken.  See Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).

A.   <u>Officer Hujsak's Threat to File Disciplinary Charge</u>

To satisfy the second element of a retaliation claim, Podkulski must show that defendants took adverse action against him.  <u>De minimis</u> reactions to protected speech will not satisfy that requirement.  See <u>Morris v. Powell</u>, 449 F.3d 682, 685-86 (5th Cir. 2006).  A defendant's reaction to protected speech is not <u>de minimis</u>, however, if defendant's conduct would deter an individual of ordinary firmness from exercising his or her First Amendment rights.  See <u>id.</u>  Here, Podkulski has alleged that Officer Hujsak, in response to Podkulski's request for grievance forms, threatened to file a disciplinary charge against him.

Consideration of whether a single disciplinary charge actually filed in response to protected speech is an adverse act requires an assessment of whether the charge and its disposition would be capable of deterring an inmate from exercising his or her First Amendment rights.  See, e.g., <u>Bridges v. Gilbert</u>, 557 F.3d 541, 555 (7th Cir. 2009) ("single retaliatory disciplinary charge that is later dismissed is insufficient to serve as the basis of a § 1983 action"); <u>Gayle v. Gonyea</u>, 313 F.3d 677, 682 (2d Cir. 2002) (inmate subjected to retaliatory disciplinary charges and subsequent punishment that would deter an inmate of ordinary firmness from exercising his First Amendment rights may

13

be entitled to relief under section 1983 (citing <u>Franco v.</u>
<u>Kelly</u>, 854 F.2d 584, 590 (2d Cir. 1988))).

Here, the complaint fails to indicate whether Officer
Hujsak ever filed a disciplinary charge against Podkulski, and
there are no allegations concerning the nature of that charge or
the risk of any sanctions it might carry.  The complaint
therefore fails to show that Officer Hujsak's threat to file a
disciplinary charge against Podkulski would deter an inmate of
ordinary firmness from engaging in protected speech.  <u>See</u> <u>Starr</u>
<u>v. Dube</u>, 334 F. App'x 341, 342 (1st Cir. 2009) (single
disciplinary charge, carrying risk of severe penalties, which
was dismissed by hearing officer one week after it was filed,
was <u>de minimis</u> act).  Accordingly, the retaliation claim based
on Hujsak's threat to file a disciplinary charge against
Podkulski should be dismissed.

    B.   <u>Sgt. John Doe's Threat to Beat Up Podkulski</u>

Podkulski has alleged that on November 18, 2010, a male
sergeant said that if he filed grievances, the officer would put
him in segregation and "beat the shit" out of him.  Podkulski
abandoned his plan to file grievances at that point, out of fear
for his safety.

The facts alleged are sufficient to state a plausible claim of retaliation for Podkulski's engaging in protected activity to initiate the grievance process.  See Hannon, 645 F.3d at 48 (inmate, in "filing his own grievances and legal actions, plainly engaged in protected activity" (footnote omitted)); Hill v. Lappin, 630 F.3d 468, 474 (6th Cir. 2010) ("threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct").  Therefore, in an Order this date, the court has indicated that it may authorize service of this claim on the officer who threatened Podkulski, once Podkulski names that individual.

C.   Assault on Podkulski

1.   Sgt. Gordon and Officer Barbara

Podkulski has alleged that Sgt. Gordon, with Lt. Robinson's encouragement, took Podkulski to a segregation cell and then, with the assistance of Officer Barbara, struck and maced Podkulski.  The complaint alleges facts that show that the assault was undertaken in retaliation for Podkulski's telling another inmate how to file a grievance.

Inmates retain those First Amendment rights to engage in speech that are not inconsistent with the corrections system's

legitimate objectives.  See Pell v. Procunier, 417 U.S. 817, 822
(1974).  While it may be proper for prison officials to regulate
jailhouse lawyering to maintain institutional security, see,
e.g., Shaw v. Murphy, 532 U.S. 223, 231-32 (2001), the facts
alleged in the complaint provide no basis for this court to find
that the officers' assault on Podkulski was reasonably related
to, or undertaken in furtherance of, any legitimate objective.
Accordingly, the facts in the complaint state a plausible claim
that Sgt. Gordon and Officer Barbara retaliated against
Podkulski for engaging in protected First Amendment activity,
and the court has directed service on those officers in their
individual capacities, in an Order issued on this date.

### 2.   Lt. Robinson

Lt. Robinson's involvement in the assault consisted of his
telling Podkulski, while Sgt. Gordon was escorting him to
segregation, that Podkulski would be taught "a lesson."  There
are no facts in the complaint that suggest that Robinson was
present for, encouraged, or otherwise participated in the
assault, or that his comment led inexorably to the subordinate
officers, outside of Robinson's presence, assaulting Podkulski
for exercising his First Amendment right.  The facts alleged do
not support a reasonable inference that Robinson even knew that

Podkulski had told other inmates how to file grievances when he
is alleged to have made the threatening comment to Podkulski.
See Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009)
("supervisory liability lies only where an affirmative link
between the behavior of a subordinate and the action or inaction
of his supervisor exists such that the supervisor's conduct led
inexorably to the constitutional violation" (internal quotation
marks and citation omitted)).  Accordingly, the First Amendment
retaliation claim asserted against Robinson should be dismissed.

III. Excessive Force

    A.    Officer Barbara and Sgt. Gordon

    The "Due Process Clause protects a pretrial detainee from
the use of excessive force that amounts to punishment."  Graham
v. Connor, 490 U.S. 386, 395 n.10 (1989); see also Surprenant v.
Rivas, 424 F.3d 5, 15 (1st Cir. 2005).  That right is at least
as protective as the Eighth Amendment's guarantee that convicted
prisoners not be subjected to excessive force.  See Burrell v.
Hampshire Cnty., 307 F.3d 1, 7 (1st Cir. 2002).

    The applicable Eighth Amendment standard is "whether force
was applied in a good-faith effort to maintain or restore
discipline, or maliciously and sadistically to cause harm."
Hudson v. McMillian, 503 U.S. 1, 7 (1992).  In asserting an

17

excessive force claim, a prisoner need not allege that he has
sustained a serious or significant injury in order to obtain
relief.  See Wilkins v. Gaddy, ___ U.S. ___, ___, 130 S. Ct.
1175, 1178 (2010).  The relevant factors cited in Hudson are:
the need for force; the relationship between that need and
amount of force applied; the extent of any injury inflicted; the
"threat 'reasonably perceived by the responsible officials;'"
and the "'efforts made to temper the severity of a forceful
response.'"  503 U.S. at 7.

     Here, Podkulski has alleged that no force was needed, as he
was complying with the officers' orders.  The complaint alleges
that Sgt. Gordon showed no restraint in macing and striking him.
Officer Barbara is alleged to have held Podkulski for the
duration of the attack and to have told him that they did not
like grievance and lawsuit filers, and that Podkulski was lucky
they did not kill him.  Podkulski has alleged sufficient facts
to state a claim under the Fourteenth Amendment that both
officers subjected him to excessive force amounting to
punishment, with a malicious or sadistic intent to cause harm.
Accordingly, in an Order issued this date, the court has
directed service of this claim against those officers in their
individual capacities.

B.   Lt. Robinson

Lt. Robinson's involvement was limited to telling Podkulski, while Gordon was taking him to the segregation cell, that he would be taught a lesson.  The complaint fails to state a plausible claim for relief, based on Robinson's isolated remark, for an attack undertaken by other officers outside of his presence.  See Maldonado, 568 F.3d at 275.  Accordingly, the court recommends dismissal of the excessive force claim as to Lt. Robinson.

IV.  Reading Materials and Mail

A.   First Amendment Rights and Standard

Podkulski has asserted that prison officials violated his First Amendment rights, in that he was not allowed to possess reading materials because he was confined in administrative segregation for eight weeks.  In addition, because he refused to make his bed while in administrative segregation, he was not permitted to send and receive mail.

Inmates have a limited First Amendment right to send and receive mail and to possess reading materials.  See Ortiz v. Fort Dodge Corr. Facility, 368 F.3d 1024, 1026 (8th Cir. 2004) (prisoners have right to send and receive mail subject to prison

officials' legitimate interest in monitoring mail for security reasons); see also Beard v. Banks, 548 U.S. 521, 533 (2006).

Prison policies burdening First Amendment rights are permissible if they are reasonably related to legitimate penological purposes. See Turner v. Safley, 482 U.S. 78, 87-89 (1987). A court, in evaluating whether or not a particular prison regulation is constitutional, should consider factors including whether the regulation has a "valid, rational connection" to a legitimate penological objective. Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (listing four factors derived from Turner, 482 U.S. at 89-91). The Supreme Court, in Beard, 548 U.S. at 533, clarified that the "real task . . . is not balancing" the factors set forth in Overton or Turner; rather, the court must determine whether the policy is not just simply logically related to a legitimate objective, but is, in fact, reasonably related, to such an objective.

In undertaking that inquiry, courts must accord prison administrators significant deference in defining legitimate goals for the corrections system and in determining the best means of accomplishing those goals. See Overton, 539 U.S. at 132. The inmate bears the burden of showing that the policy at

issue was an exaggerated response to a legitimate objective.
See id.

### B.   Possession of Reading Materials

A policy of restricting reading materials available to an
inmate in administrative segregation may be found to be
reasonably related to the deterrence of bad behavior and the
maintenance of order and security in a prison, as applied to
intransigent inmates.  See, e.g., Wickner v. Symmes, No. Civ.
09-940 DWF/JJK, 2010 WL 3385101, *3-*5 (D. Minn. July 22, 2010)
(citing Beard, 548 U.S. at 530-33).  The restriction at issue
here appears rationally related to a deterrence rationale and to
the underlying goal of maintaining security and avoiding the
costs of bad behavior.  As an incentive for inmates to avoid
engaging in the bad behavior that could result in administrative
segregation, inmates in the general population are permitted to
possess certain reading materials in their cells.  Inmates in
administrative segregation cannot do so, but are allowed to read
the newspaper each day if they make their beds and clean their
cells first.  Nothing in the complaint indicates that the
restriction at issue, as applied to inmates in administrative
segregation, was excessive relative to those legitimate
objectives.  Therefore, Podkulski has failed to state a

plausible claim for relief for a violation of his First
Amendment rights.  See Beard, 548 U.S. at 530-33 (denial of all
access to newspapers, magazines, and photographs for
"intractable" inmates in long-term segregation was reasonably
related to legitimate interests in providing incentives for
better prison behavior).  Accordingly, the court should dismiss
the claim.

     C.    Writing Letters, Receiving Mail, and Reading the Paper

    While in administrative segregation, Podkulski was subject
to further restrictions:  inmates who made their beds and
cleaned their cells could leave their cells for an hour, during
which they could engage in correspondence and read a newspaper,
but Podkulski was denied that opportunity because he refused to
make his bed.  The requirement that an inmate make a bed each
day is logically related to an interest in ensuring safe and
orderly conditions in inmate cells.

    A one-day limitation on letter writing, receiving mail, and
reading the newspaper could be found to be reasonably related to
a legitimate objective, as a sanction imposed on an intransigent
inmate who is already subject to heightened restrictions while
in administrative segregation.  See Little v. Norris, 787 F.2d
1241, 1243 (8th Cir. 1986) (30-day withholding of mail from

prisoner in punitive isolation did not amount to constitutional violation); see also Dupont v. Dubois, 99 F.3d 1128 (unpublished table decision), 1996 WL 649340, *3 (1st Cir. 1996) (withholding inmate mail for up to eleven days when inmate was in strip cell did not violate First Amendment).

On any given day, Podkulski could have chosen to catch up on his letter writing, mail, and the day's news, simply by making his bed.  Nothing in the complaint suggests that such a day-to-day restriction on Podkulski's ability to leave his cell to engage in those activities was an exaggerated response to the prison officials' legitimate objectives.  Accordingly, Podkulski's First Amendment claims relating to the restrictions imposed upon him should be dismissed.

V.    Rights to Counsel and to Access Courts

Podkulski has asserted that his rights to counsel and to access the courts were violated when inadequate lighting prevented him from doing legal work, and when he was not allowed to contact counsel by phone or mail because his out-of-cell time was restricted.  In the absence of a showing of improper motive or injury, such claims must be dismissed.  See Hudson v. O'Brien, No. 09-10276-RWZ, 2010 WL 2900529, *2 (D. Mass. July 21, 2010) (dismissing claims based on isolated instances where

prison officials opened incoming legal mail); see also Lewis v. Casey, 518 U.S. 343, 351 (1996); Boivin v. Black, 225 F.3d 36, 43 n.5 (1st Cir. 2000) ("a prisoner must show actual injury in order to demonstrate a violation of the right of access to the courts").  Because Podkulski has not shown any improper motive or injury with respect to those claims, the claims should be dismissed.

VI.  Conditions of Confinement

Podkulski's claims regarding the conditions of confinement are that, for the duration of his time at HCDC, guards enforced a lights-out policy at night, leaving him in the dark for an unspecified period of time each night.  Additionally, for eight weeks, while in administrative segregation, he did not have access to commissary hygiene items including toothpaste, antacids, cough drops, and deodorant.  Additionally, because he did not make his bed each day as directed, Podkulski was not allowed out of his cell at all almost every day, for eight weeks.  That further restriction prevented him from exercising out of his cell, showering, and brushing his teeth.

A.    Eighth and Fourteenth Amendment Standard

Detainees have a constitutional right under the Due Process
Clause to be free of any restrictions intended to punish them
for their charged offenses, while convicted inmates have a right
under the Eighth Amendment to be free of punishment that is
cruel or unusual.  See Surprenant v. Rivas, 424 F.3d 5, 15 (1st
Cir. 2005) (citing O'Connor v. Huard, 117 F.3d 12, 15 (1st Cir.
1997)).  For the purposes of analyzing claims challenging the
conditions of confinement, however, the standards are
effectively equivalent:  claims challenging the conditions of
confinement, under either the Fourteenth or Eighth Amendment,
must state facts establishing both an objective and a subjective
component.  See Surprenant, 424 F.3d at 18.  The objective
component requires the plaintiff to demonstrate that he has been
subjected to specific deprivations that are so serious that they
deny him the minimal measure of necessities required for
civilized living.  See id.  The subjective component requires
the plaintiff to show that defendants were deliberately
indifferent to his health or safety.  See id. at 18-19.

B.    Lighting

Adequate lighting has been identified as one of the
fundamental attributes of adequate shelter required by the

25

Eighth Amendment.  See Hoptowit v. Spellman, 753 F.2d 779, 783
(9th Cir. 1985).  Podkulski has not stated in the complaint how
long the lights were out each night.  He has also failed to
assert facts indicating that the inadequate lighting caused him
to suffer any health problems or resulted in any unsanitary
conditions in his cell, or that any prison official was
deliberately indifferent to such risks.  See Bacon v. Minner,
229 F. App'x 96, 99-100 (3d Cir. 2007) (allegations regarding
prison's pattern of turning off cell lights from 11:30 p.m. to
4:45 a.m. did not describe conditions that were objectively
serious enough to warrant further inquiry under Eighth
Amendment); Fisher v. Dep't of Corr., No. 92 CIV. 6037 (LAP),
1995 WL 608379, *5 (S.D.N.Y. Oct. 16, 1995) (lack of lighting at
night for 20 days did not violate Eighth Amendment, where
darkness, which made reading and writing impossible and caused
inmate to bump into things, was shown to be merely inconvenient
to prisoner).  Accordingly, the claims should be dismissed.

    C.   Commissary Hygiene Items

    Podkulski's claims regarding the lack of access to certain
commissary items fails to state a claim upon which relief can be
granted, for violations of his rights under the Eighth or
Fourteenth Amendment.  Podkulski has failed to allege any facts

suggesting that he had a medical need for hygiene products,
including, specifically, toothpaste, deodorant, cough drops, and
antacids, or that any prison official was deliberately
indifferent to a serious risk to his health or safety in denying
him access to those items for eight weeks.  The lack of such
allegations is fatal to his claim.  See Crump v. Janz, No. 1:10-
cv-583, 2010 WL 2854266, *4 (W.D. Mich. July 19, 2010)
(deprivation of toothbrush and toothpaste for 35 days, not shown
to have resulted in harm to inmate's dental health, did not
violate Eighth Amendment)  Accordingly, the claims relating to
the lack of access to such items should be dismissed.

 D. Out-of-cell Time, Toothbrushing, Showering, Exercise

 Podkulski has asserted that while in administrative
segregation, he received no out-of-cell time because he refused
each day to make his bed.  As a consequence of refusing to do so
each day, Podkulski was denied the opportunity to exercise out
of his cell, shower, or brush his teeth almost every day during
the eight weeks of his administrative segregation.  Nothing in
the complaint suggests that the alleged lack of shower time,
tooth brushing opportunity, or exercise caused Podkulski any
injury.

Other courts have rejected claims similar to Podkulski's,
where the allegedly unconstitutional conditions resulted from an
inmate's refusal to comply with a valid prison rule that served
a legitimate purpose, and the inmate always retained the ability
to avoid the consequences by choosing to comply with the rule.
See, e.g., Rodriguez v. Briley, 403 F.3d 952, 952-53 (7th Cir.
2005) (inmate who missed 75 showers and more than 300 meals over
eighteen months, for refusing to comply with rule that he put
items in storage box before leaving for meals or showering, did
not establish Eighth Amendment violation, as "deliberate
noncompliance with a valid rule does not convert the
consequences that flow automatically from that noncompliance
into punishment"); Talib v. Gilley, 138 F.3d 211, 214 (5th Cir.
1998) (rejecting Eighth Amendment claim of inmate who lost meals
because he did not comply with in-cell feeding instructions
shown to be reasonably related to legitimate penological
interest); cf. Foster v. Runnels, 554 F.3d 807, ___ (9th Cir.
2009) (consequences resulting from inmate's refusal to comply
with orders not shown to be reasonably related to any legitimate
purpose could form basis for Eighth Amendment claim).

Here, Podkulski needed only to make his bed to take a
shower, exercise, or brush his teeth each day, and the policy of

requiring an inmate to make a bed appears reasonably related to a legitimate institutional goal.  Cf. Rodriguez, 403 F.3d at 952 (rule requiring inmates to store certain belongings in storage boxes whenever they are outside of their cells enhances fire safety and facilitates searches of cells).  Podkulski has not shown that any prison official was deliberately indifferent to any serious risk to his health or safety, resulting from the imposition of those conditions upon him.  As such, the complaint fails to state a claim under the Fourteenth or Eighth Amendment. For that reason, the court should dismiss Podkulski's claims, based on the consequences of his refusal to make his own bed.

## VII. Supervisory and Municipal Liability

Supervisory liability under section 1983 lies only where the "supervisor's conduct led inexorably to the constitutional violation."  See Maldonado, 568 F.3d at 275.  A similar limitation applies for finding municipal liability.  See Connick v. Thompson, ___ U.S. ___, ___, 131 S. Ct. 1350, 1359 (2011) (municipalities may not be held vicariously liable under section 1983); Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005) ("it is only when the governmental employees' 'execution of a government's policy or custom . . . inflicts the injury' and is 'the moving force' behind the

constitutional violation that a municipality can be liable"
under section 1983 (citation omitted)).

Nothing in the complaint shows any grounds for finding
supervisory or municipal liability as to the claims that this
court has deemed viable.  Podkulski has not stated any facts to
support a claim, under Maldonado, 562 F.3d at 275, that O'Mara
or any other supervisor's conduct or inaction "led inexorably"
to subordinate officers:  ordering an inmate prone to seizures
to sleep on a top bunk; exposing an inmate to human waste for
days; using excessive force; or threatening to beat up an inmate
for pursuing grievances or for telling others how to do so.
Furthermore, Podkulski has not shown that the execution or
implementation of any municipal policy caused those officers to
engage in the allegedly unconstitutional conduct.  See Young,
404 at 25.  Accordingly, any claim of supervisory or municipal
liability in the complaint (doc. no. 1) should be dismissed.

### Conclusion

With the exception of the claims asserted against Officer
FNU Barbara and Sgt. FNU Gordon, individually, and the claims
asserted against presently unnamed officers potentially
responsible for Podkulski's fall from the top bunk and exposure
to human waste, the claims asserted in the complaint (doc. no.

1) should be dismissed.  In particular, all claims asserted against Officer Hujsak, Superintendent James O'Mara, and Lt. Robinson should be dismissed for failure to state a claim upon which relief may be granted.

In an Order issued on this date, the court has directed service of the excessive force and retaliation claims asserted against Barbara and Gordon in their individual capacities.  In that Order, the court has also granted Podkulski leave to file a proposed amendment to the complaint, identifying the presently unnamed individuals who may be held liable on the claims that this court would consider viable but for Podkulski's failure to name defendants.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011) (citing United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008)); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to

review by district court; issues not preserved by such objection
are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge

December 20, 2011

cc:  Steve Podkulski, pro se

LBM:nmd